FILED

2020 Mar-06  PM 03:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREGORY MINARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:18-cv-01222-AKK** |
| | ) | |
| **SAM'S EAST, INC. d/b/a** | ) | |
| **SAM'S CLUB,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Jonathan S. Harbuck
Lynlee Wells Palmer
Brandon A. Jackson
Attorneys for Defendant
Wal-Mart Stores East, LP
**HARBUCK KEITH &
HOLMES LLC**
3595 Grandview Parkway, Suite 400
Birmingham, Alabama 35243

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................. 1

II.  STATEMENT OF FACTS .................................................... 1

     A.   The Parties ................................................................ 1

     B.   The Truckload and Direct Ship Processes ...................... 2

     C.   The French Fry Investigation ...................................... 5

     D.   US Ethics .................................................................. 9

     E.   Plaintiff's Employment Termination ............................ 12

     F.   Plaintiff's Open Door Process ..................................... 14

     G.   The Closure of Club 8212 ........................................... 14

     H.   Investigations Into Conduct by Nadine Smith and Elizabeth
          Bowler ..................................................................... 15

     I.   Procedural Posture .................................................... 17

III. ARGUMENT ...................................................................... 18

     A.   Plaintiff's Claims of Discrimination Are Unfounded ...... 18

          1.   Plaintiff Cannot Establish a *Prima Facie* Case as to
               Any of His Discrimination Claims ......................... 18

          2.   Sam's Had a Legitimate Reason for Plaintiff's
               Employment Termination .................................... 23

          3.   Plaintiff Cannot Meet His Pretext Burden .............. 23

     B.   Plaintiff's Negligence Claims Are Due to be Dismissed .... 27

IV.  CONCLUSION ..................................................................... 28

## I.    INTRODUCTION

Plaintiff, a Club Manager for Defendant Sam's East, Inc., was terminated for failing to follow company policy governing the sale of merchandise by the truckload. Although the policy specifically prohibited the "pre-ringing" of merchandise (ringing up the sale at the register before the merchandise arrived at the Club), Plaintiff admits he routinely did so. Furthermore, the timing of the pre-ringing was such that Plaintiff could have impacted his own bonus by artificially inflating the Club's monthly revenue prior to a sale actually taking place. Plaintiff also admits to using a Member's credit card outside the presence of the Member in the pre-ringing process, which, along with taking credit for sales that had not yet taken place, contributed to the finding that Plaintiff committed a financial integrity violation. It was Plaintiff's policy violation, and not any alleged race discrimination, age discrimination, or negligence, that caused the termination of his employment.

## II.   STATEMENT OF FACTS

### A.    The Parties.

Plaintiff Gregory Minard (African-American, age 57 in 2017) worked as the Club Manager at Sam's Club ("Sam's") 8212 in Irondale, Alabama.[1] (Doc. 14, ¶¶

---

[1] Plaintiff's deposition is cited by page and line numbers as (Pl., p. #, ll. #s). Other depositions are cited by page and line numbers as (Deponent Initials, p. #, ll. #s). Deponent initials key: MB = Marshall Bacote; RD = Reeca Dildy; AFM = Alejandro Figueroa-Munoz; DG = Daren Goodroe; DH = Deltrinae Hodges; BN = Ben Newton; AR = Athena Rushforth.  Deposition exhibits introduced by Defendant are cited as "Def. Ex. #" and exhibits introduced by Plaintiff are cited as "Pl. Ex. #."  Documents filed with the Court are cited by document number (Doc. #, ¶ #).

17-18).  As Club Manager, Plaintiff was responsible for the overall operation of the Club, including sales, membership, financial stability and responsibility, accurately reporting information regarding the Club, associate supervision and training, and community outreach.  (Pl. p. 53, ll. 22-25; p. 54, ll. 1-19).  Sam's is a membership warehouse club. See https://corporate.samsclub.com/our-company.  The company's Clubs are organized into geographically-based Markets, each of which is part of a larger geographic Region.  (AFM p. 25, ll. 14-23; p. 90, ll. 8-23).  At all relevant times, Club 8212 was part of the Southeast Region, Market 2.  (AFM p. 29, ll. 17-20; p. 92, l. 23; p. 93, l. 1).

Sam's is a division of Walmart Stores, Inc., and the two organizations share a Statement of Ethics, which states: "the foundation of our culture is a commitment to operating with integrity." (Pl. p. 109, Def. Ex. 8, p. 00364).  The companies' four core beliefs are: respect for the individual, service to our customers, striving for excellence, and act with integrity.  Id. at 00366.

**B.    The Truckload and Direct Ship Processes.**

In addition to sales made directly from its in-store inventory, Sam's also sells merchandise in larger quantities, including by the truckload, as well as merchandise shipped directly from the vendor to the Member. (Pl. p. 119, ll. 23-25).  Through Plaintiff, Wood Fruitticher[2] purchased truckloads of French fries from Club 8212,

---

[2] Wood Fruitticher is a Sam's corporate Member and a grocery distributor.  (Doc. 14 ¶ 32).

beginning in 2012.  (Pl. p. 125, ll. 5-12; Doc. 2 ¶ 32; Doc. 14 ¶ 32).  The price of French fries or other items purchased by the truckload is typically at a volume discount and, thus, less than the price of the same amount of French fries purchased in the Club.  (Pl. p. 128, ll. 18-25; p. 129, ll. 1-2).  Because of the price difference, French fries purchased by the truckload often have a different inventory item number than the same French fries sold in the Club.  (Pl. p. 128 ll. 18-25; 129 ll. 1-9). Truckload orders are part of Sam's' Wholesale Trading Group.  (Pl. p. 131, ll. 5-11).

A sale is "rung up" when the Member pays for the item and the store takes credit for the sale by running the transaction through the register. (Pl. p. 134, ll. 7-13; p. 135, ll. 19-24). Sam's' Wholesale Trading Payment Procedures permit Members to "pay by Cash, Check, Credit Card, Sam's Club direct account, Wire Transfer, or Letter of Credit."  (Pl. Ex. 10, ¶ 2).  The Procedures specifically state: "Never pre-ring truckload sales." Id.  In other words, the policy prohibits ringing up merchandise and taking credit for the sale before the merchandise arrives at the Club. (Pl. p. 204, ll. 11-24; AFM p. 514, ll. 2-12).  Members are permitted, however, to pre-pay for truckload merchandise, provided the transaction is not rung through the register until the merchandise arrives at the Club.  (Pl. Ex. 12).  The policy states: "Pre-payment can be accepted in full. (**Do not ring up at the register**)."  (Pl. Ex. 12, ¶ 5)(emphasis in original).  Instead of ringing the transaction at the register, pre-payments are to be maintained in the Club's 534 account, where they remain "until

the day you receive the merchandise at your club or until you receive notification by Club Support to ring up the sale." Id. at ¶¶ 7-8. After the merchandise arrives at the Club, the transaction may be rung, or processed, through the cash register, officially registering that a sale has taken place. (Id. at ¶¶ 8-9; Pl. p. 134, ll. 7-13; p. 135, ll. 19-24).

Plaintiff contends he contacted Sam's' home office when he received his first truckload order in 2012 and spoke to Don Mills, whom Plaintiff asserts was "over wholesale trading" in Bentonville, Arkansas. (Pl. p. 131, ll. 2-8). According to Plaintiff, Wood Fruitticher approached him and asked to purchase ten (10) trailer loads of French fries. (Pl. 132, ll. 13-16). Plaintiff "remember[s] it clearly" that Mr. Mills' immediate reaction was to ask, "do you know this member?" (Pl. p. 132, ll. 17-20). When Plaintiff responded that he did not, Mr. Mills allegedly recommended that Plaintiff obtain pre-payment. (Pl. p. 132, ll. 17-24). Plaintiff says Mr. Mills told him "if [Plaintiff] was ordering 10 trailer loads of French fries to a member that [he] was not familiar with, that [he] needed to go ahead and take prepayment for those. Ring [the Member] up." (Pl. p. 134, ll. 3-6). Ten trailer loads of French fries is a substantial volume; indeed, Reeca Dildy, who placed the truckload French fry orders with the vendor after receiving them from the Club, said she would not place an order that large. (RD p. 41, ll. 6-17). Although Plaintiff claims he spoke to Don Mills again after that initial conversation, he did not testify as to any conversation

4

with Mr. Mills about the proper procedures for handling subsequent truckload orders, including truckload orders for customers like post-2012 Wood Fruitticher, whom Plaintiff *did* know.  (Pl. p. 153, ll. 15-25; p. 154, ll. 1-6; p. 283, ll. 22-25). Although he knew he could find Sam's' policies and procedures on the WIRE, a company Intranet, Plaintiff admits he never reviewed Sam's' policies governing truckload order transactions, including the Wholesale Trading Payment Procedures. (Pl. p. 65, ll. 24-25; p. 66, ll. 1-4; p. 202, ll. 13-16).

In addition to truckload orders, Sam's also provides its Members with the option to "direct ship" some types of merchandise under certain circumstances.  (Pl. p. 250, ll. 20-25; p. 251, ll. 1-6; AFM p. 239, ll. 6-16).  "Direct ship" orders are those placed by the Club on behalf of the Member, but which never physically come through the Club.  Id.  Instead, these orders are shipped directly from the vendor to the Member.  Id.  In contrast with truckload orders, direct ship orders *require* pre-ringing because the merchandise never comes to the Club.  (RD p. 21, ll. 6-13; AFM p. 239, ll. 6-16).

C.    **The French Fry Investigation.**

In April 2017, Sam's reorganized its markets and regions.  (AFM p. 131, ll. 17-23; p. 132, ll. 1-4).  As a result of the reorganization, Field People Partner Alejandro Figueroa-Munoz (Hispanic, age 46 in 2017) and Market Asset Protection Manager ("MAPM") Athena Rushforth (Caucasian, age 47 in 2017) assumed the

human resources and loss prevention support responsibilities, respectively, for Club 8212. (AFM p. 131, ll. 17-23; p. 132, ll. 1-4; AR p. 10, ll. 10-21; p. 81, ll. 5-9). Although both Mr. Figueroa-Munoz and Ms. Rushforth came from other human resources and loss prevention roles with Sam's, neither had any prior experience with Plaintiff before the reorganization. (AFM p. 481, ll. 20-23; AR p. 34, ll. 22-23; p. 35, ll. 1-4).

Ms. Rushforth first visited Club 8212 on July 12, 2017 to assist the Club in preparation for an upcoming third-party inventory audit on July 24, 2017. (AR p. 21, ll. 7-11; p. 22, ll. 7-17). Plaintiff was not in the Club on July 12, but the Club's Asset Protection Manager, Kim Nelson, notified Ms. Rushforth that there was a problem with the on-hand inventory for French fries that neither she nor Plaintiff had been able to resolve. (AR p. 30, ll. 11-23; p. 31, ll. 1-12; p. 32, ll. 15-23; p. 34, ll. 17-21). "On-hand" inventory means the amount of a certain product that has been received (checked in) to the Club and should be available for sale. (Pl. p. 173, ll. 19-21; DG, p. 13, ll. 20-23; p. 14, ll. 1-6). In a truckload sale, the merchandise is counted into the Club's inventory as it comes off of the vendor's delivery truck and before it is loaded onto the Member's truck. (Pl. p. 140, ll. 23-25; p. 141, ll. 1-11). A "negative on-hand" means that certain items have been sold, but were not checked into the Club's inventory. (Pl. p. 173, ll. 22-25; 174 ll. 1-8; AR p. 104, ll. 20-23; p. 105, ll. 1-6; DG p. 26, ll. 15-23). Ms. Rushforth asked the Club to re-audit the French

6

fries so she could research what was causing the negative on-hand numbers.  (AR p. 31, ll. 7-12).  Thereafter, Plaintiff provided Ms. Rushforth (via email) with the audit numbers reflecting the on-hand inventory for French fries at Club 8212. (AR p. 34, ll. 13-16; Pl. Ex. 69, p. 004324).

Because the negative on-hand issue needed to be resolved before the third-party inventory company arrived on July 24, Ms. Rushforth contacted Daren Goodroe, who provided asset protection support at Sam's' home office in Arkansas. (AR p. 35, ll. 18-23; p. 36, ll. 1-2; DG p. 30, ll. 19-23; p. 31, ll. 1-23; p. 32, ll. 1-7). Ms. Goodroe had experience researching asset protection issues to identify the cause of an inventory discrepancy, so she began exploring various reasons why the French fries might have "gone negative" in the Club's inventory.  (AR p. 36, ll. 3-17; DG p. 23, ll. 11-19; p. 28, ll. 4-23; pp. 29, l. 1 – p. 39, l.8).  Ms. Goodroe's research included reaching out to the truckload team about the item numbers and to other individuals about possible open purchase orders.  Id.

On July 18, 2017 at 2:00 p.m., Ms. Goodroe and Ms. Rushforth had a conference call with Plaintiff to discuss the Club's efforts to resolve the negative on-hand issue and possible solutions to resolve the negative on-hand issue prior to inventory.  (Pl. p. 136, ll. 13-21; p. 198, ll. 19 - p. 202, l. 12; DG p. 21, ll. 2-9; AR p. 162, ll. 11; p. 163, ll. 1-9; p. 199, ll. 16-20; p. 227 ll. 10-23; p. 228, ll. 1-18). According to Ms. Goodroe and Ms. Rushforth, Plaintiff said he had been ringing up

the French fries (taking payment for them and indicating a sale at the register) before the French fries arrived at the Club and that he knew pre-ringing the merchandise was not the right thing to do. (DG p. 46, ll. 3-26; p. 57, ll. 10-16, p. 59, ll. 2-7; AR p. 228, ll. 7-18; p. 175, ll. 2-5). Additionally, Plaintiff informed Ms. Goodroe and Ms. Rushforth that he had not received approval from anyone at the market level to pre-ring the sales, nor had he contacted anyone in the market to discuss the negative on-hands in the six (6) months since the problem began in January 2017.[3]  (AR p. 80, ll. 19-23; p. 81, ll. 1-12; DG p. 62, ll 2-9; Pl. Ex. 47, pp. 04392, 04396).[4]

Following the conference call, Ms. Rushforth reached out to her boss, Regional Asset Protection Manager Hugh Zengerle (Caucasian, age 47 in 2017), about the negative on-hands. (AR p. 9, ll. 5-16; p. 62, ll. 2-23; p. 63, l. 1; Pl. Ex. 69; DG. p. 33, ll. 22-23; p. 34, ll. 1-8; Pl. Ex. 47, p. 04404).  She also informed Mr. Zengerle that Plaintiff admitted on the conference call he had been ringing up the French fries before they arrived in the Club, he knew it was not the right thing to do, he had taken possession of the Member's credit card, and he had used it to ring up

---

[3] Plaintiff denies saying that pre-ringing the merchandise was not the right thing to do.  However, this alleged statement is included here because it was relayed to and relied on by others during the course of the investigation.  Thus, even if such statement is untrue, it is clear that many believed it to be true in making the decision to terminate Plaintiff's employment.

[4] While Plaintiff had notified Mr. Bacote of an issue requiring a refund to a Member when the Member was "shorted" 1400 cases of French fries, Ms. Rushforth stated that issue was "totally different" than notifying him of a negative on-hand situation.  (Pl. Ex. 53; AR p. 173, ll. 5-19; p. 179, ll. 3-17).

the French fries without the Member present.[5]  (Pl. Ex. 69).  Mr. Zengerle reported the concerns about pre-ringing and the credit card to US Ethics on August 14, 2017. (Pl. Ex. 2, pp. 1-3).

 **D.** **US Ethics.**

 US Ethics oversees investigations of alleged violations of the Statement of Ethics and makes accountability recommendations for associates found in violation. (DH p. 23, ll. 11-17; p. 30, ll. 14-18; BN p. 55, ll. 1-21; AFM p. 45, ll. 18-23).  The Statement of Ethics includes a provision addressing financial integrity, stating "Walmart requires honest and accurate recording and reporting of financial information to make responsible business decisions.  All financial books, records and accounts must accurately reflect financial transactions and events." (Pl. Ex. 8, p. 00083, ¶ 1).

 US Ethics does not, itself, conduct investigations; rather, it receives complaints regarding possible Statement of Ethics violations and assigns the investigation of those complaints to appropriate individuals, based on the type of

---

[5] Sam's associates are not permitted to take possession of a Member's credit card without the Member present, nor are they permitted to use the Member's credit card outside the presence of the Member.  (AFM p. 165, ll. 17-23; p. 166, ll. 1-10; 336, ll. 11-23).  While Sam's has a process by which a Club can complete a credit card authorization form and maintain the Member's credit card information in a locked file, Plaintiff admits he never used such a form, but instead picked up (or directed an associate to pick up) the Member's credit card, brought it back to the Club, and then returned the Member's credit card to the Member's location.  (AFM p. 336, ll. 13-23; p. 337, ll. 1-19; Pl. p. 160, ll. 2-25; p. 161, ll. 1-25; p. 162, ll. 1-8; p. 163, ll. 1-23; p. 166, ll. 6-17).

allegations made.  (BN p. 17, ll. 11-23; p. 18, ll. 1-5; DH p. 23, ll. 13-17).  With

regard to Plaintiff's possible Ethics violation, the matter involved asset protection,

so it was assigned to Ms. Rushforth, the MAPM, to investigate.  (BN p. 17, ll. 17-

23; p. 18, ll. 1-9).  Deltrinae Hodges, Senior Manager, US Ethics, was the Lead Case

Manager assigned to oversee the investigation.  (DH p. 22, ll. 6-14; BN p. 19, ll. 3-

5).

       Mr. Zengerle's initial report to US Ethics stated:

> We have an incident potentially meeting the Immediately
> Reportable Criteria (IRC).  Club Manager, Greg Minnard
> [*sic*], in Club 8212, Irondale, Alabama, admitted to Market
> Asset Protection Manager, Athena Rushforth and Sr.
> Manager of Experience Protection, Merchandise, Darren
> [*sic*] Goodroe that he has accepted payment for
> merchandise prior to the product arriving at the Club and
> being given to the Member.  Additional concerns with
> these transaction [*sic*] are; [*sic*] 1. It is believed some of
> these transactions occurred in January of 2017 and could
> have potentially impacted bonus payout.[6]  2. It is also
> believed that some of the transactions occurred without the
> member present.  Below is a recap of the conversation
> between Rushforth, Goodroe, and Minnard [*sic*].
> Rushforth and Goodroe can provide further details
> regarding these transactions upon request.

---

[6] Registering a sale before the sale occurs, particularly where, as here, the sale is registered a
significant time prior to the sale occurs, might result in financial gain for the manager "because it
might inflate the numbers at the end of the year or at the end of the quarter when bonuses, or MIPs,
Management Incentive Plans, are calculated at the end of the month."  (AFM p. 134, ll. 3-23).
Sam's' fiscal year ends on January 31 of each year.  (AFM p. 267, ll. 16-17).

(Pl. Ex. 2, p. 2).  Mr. Zengerle then pasted an email he had received from Athena Rushforth on August 11, 2017[7] detailing the conversation Ms. Rushforth and Ms. Goodroe had with Plaintiff on July 18, 2017.  Id.  Thus, at the time Mr. Zengerle submitted the initial report to US Ethics, Ms. Rushforth had already participated in the conference call during which she and Ms. Goodroe discussed with Plaintiff the financial integrity issue his conduct posed and had already questioned him about his processes.  Id.

Due to paid time off conflicts, it took approximately six (6) weeks for Ms. Hodges and Ms. Rushforth to connect and discuss Mr. Zengerle's report.[8]  (AR p. 109, ll. 19-23; p. 110, ll. 1-4).  Once they spoke via telephone on September 27, 2017, Ms. Rushforth explained the July 18, 2017 conference call to Ms. Hodges and sought guidance on next steps.  (Pl. Ex. 2, p. 00501; DH p. 37, ll. 9-12).  Ms. Hodges informed Ms. Rushforth that Plaintiff's admissions on the call constituted a financial integrity issue and "false sale," for which he could be held accountable.  (Pl. Ex. 2, p. 00501).  US Ethics' Allegation Dictionary defines "false sale" as "[r]ecording sales or returns that were not actually made, or where the merchandise had not yet been delivered when the sale was registered."  (Pl. Ex. 7, p. 01151).  Ms. Rushforth

---

[7] Ms. Rushforth initially relayed the conference call to Mr. Zengerle and Mr. Bacote on July 18, 2017, the same day the call occurred.  (Pl. Ex. 76).
[8] The Ethics report documents multiple attempts to connect.  (DH, p. 34, ll. 10-23; p. 35, l. 1 – p. 37, l. 14; Pl. Ex. 2).

informed Ms. Hodges that Plaintiff had already received two written coachings and, thus, Ms. Hodges concluded accountability for the financial integrity issue could result in termination. (Pl. Ex. 2, p. 00501). [9]

Following the call with Ms. Rushforth, Ms. Hodges discussed the matter with her boss, Ben Newton (Caucasian, age 39 in 2017), who agreed that accountability resulting in termination was appropriate based on Plaintiff's admissions from the conference call between Plaintiff, Ms. Goodroe, and Ms. Rushforth. (BN p. 40, ll. 22-23; p. 41, ll. 1-15).   Thereafter, Ms. Hodges obtained statements from Ms. Goodroe, Plaintiff, and Plaintiff's direct supervisor, Market Manager Marshall Bacote (African-American, age 51 in 2017).  (DH p. 102, ll. 17-23; p. 103, ll. 1-4; AR p. 187, ll. 14-23; p. 188, ll. 1-4; MB p. 16, ll. 13-14; p. 281, ll. 12-13 (redacted for privacy)).

### E.    Plaintiff's Employment Termination.

Ms. Hodges recommended that Plaintiff's employment be terminated based on the information gathered during the investigation.  (DH p. 30, ll. 14-18; AR p. 142, ll. 12-23; p. 143, ll. 1-3; Pl. Ex. 2, p. 00501).  At the time of his termination,

---

[9] Coaching for Improvement is Sam's' version of progressive discipline. (Pl. p. 63, ll. 5-25; Def. Ex. 3).  The Coaching for Improvement policy expressly states that "levels of coaching may be skipped, depending upon the determination by your supervisor or manager of the appropriate level of coaching for the particular situation." (Def. Ex. 3, p. 00400). The policy further states, "if your unacceptable conduct is found to be serious, this may result in your immediate termination.  In such cases, you will not be eligible for rehire.  Examples of misconduct that may warrant immediate termination include . . . [t]heft, fraud or abuse of an associate benefit *or other action involving financial integrity issues*." (Def. Ex. 3, p. 00402)(emphasis added).

Plaintiff had two active, written coachings.  (DH p. 105, ll. 9-13). If a level in the coaching process were skipped, Plaintiff would have exhausted the Coaching for Improvement Process, and his employment would have been terminated. (Id.; AFM p. 381, ll. 2-20).  Ms. Hodges determined that a skip-level coaching was appropriate based on her review of Plaintiff's conduct.  Id.  After Ms. Hodges recommended termination, Mr. Figueroa-Munoz and Mr. Bacote determined that, due to the financial integrity issues associated with Plaintiff's violation of company policy, his actions constituted gross misconduct, which warrants immediate termination. (AFM p. 111, ll. 4-23; p. 425, ll. 17-20; Def. Ex. 3, p. 00402 ).  Ms. Rushforth drafted proposed language for the Exit Interview and forwarded it to Mr. Figueroa-Munoz for his review and comment.  (Pl. Ex. 25, p. 00458; AR p. 147, ll. 7-11).  Mr. Figueroa-Munoz edited the draft language and forwarded it to Mr. Bacote for inclusion on the Exit Interview.  (Pl. Ex. 25, p. 00457).

Mr. Bacote and a witness met with Plaintiff to relay the termination decision; Mr. Bacote read Plaintiff the termination verbiage from the Exit Interview. (MB p. 22, ll. 18-22).  Plaintiff and Mr. Bacote discussed Plaintiff's intent to use Sam's' open door process for further review of his termination, and Mr. Bacote "said that the open door is there and you're welcome to use that as you see such [sic]."  (MB p. 24, ll. 7-13; Pl. p. 227, ll. 1-12). The "open door" process allows associates to address concerns about their employment, or the termination thereof, with members

13

of management in their chain of command, up to and including the highest officer in the company. (Pl. Ex. 41).

### F.   Plaintiff's Open Door Process.

On the date of his termination, Plaintiff sent an email to Doug McMillon, CEO of Walmart Stores, Inc., to "open door" the termination decision. (Pl. p. 227, l.4; p. 240, ll. 20-23; p. 241, ll. 1-16; Def. Ex. 14; AFM p. 302, ll. 16-19). He did not include in his open door email any allegation of discriminatory conduct. (Pl. p. 242, ll. 16-21). Although the open door investigation was initially assigned to Mr. Figueroa-Munoz, he declined to conduct the investigation because of his involvement in the decision to terminate Plaintiff. (AFM p. 305, ll. 20-23; p. 306, ll. 1-7; p. 375, ll. 12-18; p. 499, ll. 4-11). Instead, Matthew Waters, Senior HR Director, investigated Plaintiff's open door complaint. (AFM p. 306, ll. 8-13, p. 348, ll. 15-20). Mr. Waters investigated and provided a "comprehensive account" to Vice President of Field HR Chelle Moore. (Pl. Ex. 63). At the conclusion of the investigation, Mr. Waters notified Plaintiff that a committee had reviewed the decision and upheld it. (Pl. p. 245, ll. 2, 15-22).

### G.   The Closure of Club 8212.

Approximately three (3) months after the termination of Plaintiff's employment, Sam's announced the closure of multiple clubs in various locations throughout the country, including Club 8212 in Irondale. (MB p. 68, ll. 8-23; p. 69,

ll. 1-2; AFM p. 439, l. 23; p. 440, ll. 1-10).  Closed Clubs' associates could transfer to open positions within Sam's or Walmart, but members of management were only permitted to do so if they had fewer than two written coachings or had a performance evaluation above "development needed." (AFM p. 442, ll. 8-19; p. 443, ll. 15-23; p. 466, ll. 5-20).  At the time of Plaintiff's employment termination, he had two active written coachings, both of which would have still been active at the time the Club closed in 2018.  (AFM p. 353, ll. 12-23; Def. Exs. 3-4).

### H.   Investigations Into Conduct by Nadine Smith and Elizabeth Bowler.

On October 31, 2017, a few weeks after Plaintiff's termination, Club 8212's Asset Protection Manager Kim Nelson contacted Ms. Rushforth by email to address the Club's inventory issues. (Pl. Ex. 30, p. 00511; DH p. 80, ll. 5-7).  Ms. Rushforth forwarded the message to Mr. Zengerle and Mr. Bacote, and Mr. Zengerle sent the information to US Ethics for further investigation of a potential financial integrity issue, just as he had done with the allegations about Plaintiff.  Id.  Ms. Rushforth was asked to investigate the situation.  Id.  During the investigation, Ms. Rushforth learned that Assistant Manager Nadine Smith had continued handling French fry and other orders the way Plaintiff had directed her to handle them, and she relayed that information to Ms. Hodges in US Ethics.  (DH p. 84, ll. 22-23, p. 85, ll. 1 – p. 87, l. 16).  Ms. Smith was not a Club Manager, and, by her own account, was handling transactions consistently with Plaintiff's direction.  Id.   Because Ms. Smith was

acting at Plaintiff's direction, she did not receive any level of coaching.  (DH p. 88, ll. 4-16).

Following the closure of Club 8212, most of Wood Fruitticher's French fry orders were transferred to the Trussville Sam's Club (Club 4817), managed by Elizabeth Bowler (Caucasian, age 50 in 2017).  (AFM p. 326, ll. 12-17; p. 491, ll. 3-6).  Plaintiff's Complaint alleged that Ms. Bowler was processing truckload orders the same way he had but had not been investigated. (Doc. 14 ¶¶ 59-60).  Thereafter, Sam's initiated an investigation to determine if Plaintiff's allegations were true. (AFM p. 313, ll. 12-23; p. 314, ll. 5-16).  After several interviews with Ms. Bowler, Mr. Figueroa-Munoz determined that Ms. Bowler was ringing the French fry transaction after she received notice that the French fries were in transit to her Club, which was approximately two days prior to the delivery of the French fries to the Club and, thereafter, the Member. (Pl. Ex. 22).  Because she was ringing the sale when the merchandise was *en route*, there was little to no opportunity for Ms. Bowler to benefit financially from the advance purchase.  (AFM p. 321, l. 1- p. 322 l. 3). Ms. Bowler had little experience handling truckload orders.  (AFM p. 324, ll. 11-13).  There was no indication that Ms. Bowler had processed Member payments without the Member present, or that she had taken possession of the Member's credit card, as Plaintiff admitted doing. (AFM p. 320, ll. 19-23; Pl. p. 160, l. 2 – p. 163, l.

23).  Finally, Sam's was not aware of any problem with negative on-hands at Ms. Bowler's Club.  (AFM p. 511, ll. 14-19).

## I.      Procedural Posture.

Following the termination of his employment, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 12, 2018, alleging race, age, and sex discrimination, and retaliation. (Pl. Ex. 16).  On May 7, 2018, the EEOC dismissed the Charge, without obtaining a Statement of Position from Sam's. (Pl. Ex. 17). This lawsuit followed on August 3, 2018.  (Doc. 2).  Initially, Plaintiff's claims were: race discrimination, harassment, and retaliation under Section 1981 and Title VII; age discrimination, harassment, and retaliation under the ADEA and AADEA; invasion of privacy; intentional infliction of emotional distress; and negligent/wanton hiring, training, supervision, and retention. (Doc. 2). Following a Motion to Dismiss (Doc. 7) and associated briefing (Docs. 18, 20, 23), Plaintiff's remaining claims are race discrimination, age discrimination, and negligent/wanton hiring, training and retention. (Docs. 14, 21, 25).  At deposition, Plaintiff was unable to identify any derogatory comments made at Sam's regarding his race, and the only age-based comment he could identify was that some managers (himself included) felt they should not include their years of service on their name badges.  (Pl. pp. 289, l. 7 – p. 290 l. 8).  The parties have completed discovery, and Sam's now seeks summary judgment on all of Plaintiff's claims.

## III.   ARGUMENT

### A.   Plaintiff's Claims of Discrimination Are Unfounded.

Each of Plaintiff's claims of discrimination is governed by the familiar McDonnell-Douglas burden shifting framework.   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).   Plaintiff has the initial burden of establishing a *prima facie* case.   If he is able to do so, the burden shifts to Sam's to articulate a legitimate, non-discriminatory reason for the termination of his employment. Plaintiff then bears the ultimate burden of demonstrating that Sam's' reason is a pretext for discrimination.   See *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002)("Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff.").   Plaintiff cannot establish a *prima facie* case with regard to any of his claims of discrimination, nor can he cast doubt upon Sam's' legitimate, non-discriminatory reason for his employment termination.

### 1.   Plaintiff Cannot Establish a *Prima Facie* Case as to Any of His Discrimination Claims

The elements of a *prima facie* case under Title VII, Section 1981, the ADEA, and the AADEA are virtually identical.   Under each statute, Plaintiff must prove (1) he is a member of the protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his protected

class more favorably than he; and (4) he was qualified to do the job.  Diamond v.

Morris, Manning & Martin, LLP, No. 11-11918, 2012 U.S. App. LEXIS 2317, *3

(11th Cir. Feb. 8, 2012) (Title VII); Shields v. Fort James Corp., 305 F.3d 1280,

1282 (11th Cir. 2002)(Section 1981); Washington v. United Parcel Serv., Inc., 567

Fed. Appx. 749 (11th Cir. 2014) (ADEA); Lambert v. Mazer Disc. Home Ctrs., Inc.,

33 So. 3d 18, 23-24 (Ala. Civ. App. 2009)(AADEA).  If Plaintiff meets his *prima*

*facie* burden, Sam's must "articulate some legitimate, non-discriminatory reason"

for its decisions, and Plaintiff must prove that Sam's' reason is pretext for

discrimination.  See Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 252-

53, 256 (1981).

Sam's concedes that: Plaintiff is African-American; over the age of forty (40);

was terminated (an adverse employment action); and, prior to the company's

knowledge of his integrity violation, was qualified for the job of Club Manager.

Plaintiff, however, cannot identify a similarly situated, younger or non-African-

American comparator who was treated more favorably than he.  In the Eleventh

Circuit,

> [t]o establish a prima facie case and raise a presumption of
> discrimination, the preferentially treated individual from
> outside the plaintiff's protected class (the "comparator")
> must be similarly situated to the plaintiff in all material
> respects.   Although what constitutes a "material"
> similarity or difference will differ from case to case, a
> similarly situated comparator generally will have
> "engaged in the same basic conduct (or misconduct) as the

> plaintiff;" "been subject to the same employment policy
> guideline, or rule as the plaintiff;" "been under the
> jurisdiction of the same supervisor as the plaintiff;" and
> "share[d] the plaintiff's employment or disciplinary
> history."

Herron-Williams v. Ala. State Univ., No. 18-10875, 2020 U.S. App. LEXIS 3796,

*13-14 (11th Cir. Feb. 7, 2020)(internal citations omitted). Plaintiff cannot meet this

standard.

Plaintiff points to Nadine Smith and Elizabeth Bowler as potential

comparators, but any contention Plaintiff is similarly situated to either is incorrect.

First, Ms. Smith was not a Club Manager, as Plaintiff was.  See Hudson v. Blue

Cross Blue Shield of Ala., 431 Fed. Appx. 868, 870 (11th Cir. 2011)(no

discriminatory intent shown where "an employer applies a rule differently to people

it believes are differently situated")(internal citation omitted); White v. Winn-Dixie

Montgomery, LLC, No. 2:14-CV-01702-RDP, 2017 U.S. Dist. LEXIS 18440, * 21

(N.D. Ala. Feb. 9, 2017)("As a general rule, a supervisor and subordinate hold

different jobs and perform different duties.  Consequently, except in unique

circumstances (not present here) it cannot be said they are 'similarly situated in all

respects.'")(internal citation omitted); Gaston v. Home Depot USA, Inc., 129

F.Supp. 2d 1355, 1371 (S.D. Fla. 2001), aff'd 265 F.3d 1066 (11th Cir. 2001);

Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 916-17 (6th Cir.

2013)(plaintiff and alleged comparator not similarly situated where "differently

20

situated in the management of the store"); (DH p. 89, ll 22-23, p. 90 l. 1). Second, Ms. Smith was not acting of her own volition but, rather, following the instructions provided to her by Plaintiff. Not only is Ms. Smith an invalid comparator, Plaintiff cannot establish a *prima facie* case by arguing differential discipline to his subordinate when he, as her supervising manager, caused the subordinate's violation in the first place.

Sam's concedes that some of Ms. Bowler's conduct is the same as Plaintiff's: she was ringing the transaction prior to the merchandise arriving at the Club and she was not using the 534 holding account. However, there were also a number of significant differences between Ms. Bowler's conduct and Plaintiff's. First, unlike Plaintiff, who had been handling truckload orders since 2012 (Doc. 14 ¶ 32), Ms. Bowler had little experience with truckloads. (AFM p. 324, ll. 11-13). Relative experience "materially differentiate[s]" one individual from another. See Herron-Williams, 2020 U.S. App. 3796 at *15 (finding individual not a similarly situated comparator where he "had nearly a decade of experience in that role, whereas [Plaintiff] had been [in the role] for only a few months" because the alleged comparator's "considerably greater experience and unique qualifications . . . materially differentiated him from [Plaintiff]."). Second, Ms. Bowler was not ringing the transaction at the time of the order, as Plaintiff had done, but rather was ringing the transaction after she received notice that the merchandise was *en route*

21

to the Club. Thus, Ms. Bowler knew the merchandise would arrive, whereas Plaintiff had no indication it would (in fact, Plaintiff had encountered problems obtaining French fries during this time period due to a vendor shortage of fries and, thus, a sale did not necessarily amount to a completed transaction). (Pl. p. 144, ll. 3-25; p. 145, ll. 17-23; AFM p. 208, ll. 1-23). Third, there was no evidence Ms. Bowler was either ringing merchandise without a Member present or taking possession of the Member's credit card, as Plaintiff admitted doing. Fourth, unlike Plaintiff's pre-ringing of merchandise, which was done weeks in advance of the actual delivery and resulted in negative on-hands beginning in January 2017 – the last month of Sam's' fiscal year and the last opportunity for Club Managers to demonstrate annual sales numbers – Ms. Bowler's pre-ringing was not done significantly in advance of the delivery, so she lacked the ability to use pre-rung sales to her own financial benefit. (AFM p. 321, 1. 1 – p. 322 l. 3). Fifth, there is no indication Ms. Bowler's Club had "gone negative" or otherwise encountered an inventory problem (much less an unsolvable inventory problem, as Plaintiff had) as a result of ringing the merchandise while it was *en route* to the Club. (AFM p. 511, ll. 16-19). Finally, the decision-makers with regard to Ms. Bowler and Plaintiff were not identical; significantly, Ms. Hodges, who recommended Plaintiff's termination, was not involved at all in the investigation into Ms. Bowler's truckload transactions. (DH p. 95, ll. 6-10). Consequently, Plaintiff and Ms. Bowler were not similarly

22

situated in all material respects, and Sam's' decision to train Ms. Bowler on the proper way to handle truckload orders was justified and non-discriminatory.

### 2.    Sam's Had a Legitimate Reason for Plaintiff's Employment Termination.

Even if the Court assumes a *prima facie* case of race or age discrimination, Plaintiff's discrimination claims fail nevertheless. Sam's articulated legitimate, non-discriminatory reasons for Plaintiff's employment termination: he violated company policy by ringing merchandise weeks before the merchandise was delivered and potentially to his own financial benefit and, in the process, improperly used a Member's credit card. See Usry v. Liberty Reg'l Med. Ctr., Inc., 560 Fed. Appx. 883, 888 (11th Cir. 2014)(violation of company policy was legitimate, non-discriminatory reason). Sam's, therefore, has met its "exceedingly light" burden. See Penn v. USF Holland, Inc., 770 F.Supp. 2d 1211, 1241 (N.D. Ala. 2010).

### 3.    Plaintiff Cannot Meet His Pretext Burden.

Because Sam's has proffered legitimate, non-discriminatory reasons for Plaintiff's employment termination, there is no longer a presumption of discrimination, and Plaintiff bears the burden of establishing "that the proffered reason was not the true reason for the employment decision." Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012). There is no evidence that Sam's' articulated reason for terminating Plaintiff's employment was a pretext for discrimination. "A reason is not pretext for discrimination unless it is shown *both* that the reason was

23

false, and that discrimination was the real reason." <u>Bruno v. Greene Cty. Sch.</u>, No. 19-10616, 2020 U.S. App. LEXIS 3153, * 7 (11th Cir. Feb. 3, 2020)(citation omitted). Here, Sam's' stated reason for termination was *not* false. Company policy prohibited Plaintiff's conduct. Plaintiff admits both that he rang up the merchandise before it arrived at the Club and took possession of a Member's credit card and used the card outside of the Member's presence. (Pl. p. 136, ll. 7-25; p. 137, l. 1; p. 160, ll. 2-25 – p. 163, l. 23). There is also no evidence, other than Plaintiff's *ex post facto* subjective belief, that discrimination was the "real" reason for Plaintiff's employment termination. While Plaintiff may perceive his termination as unfair or even unjustified, his personal disagreement with the conclusions Sam's reached is irrelevant. <u>See</u> <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000)("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

Even if Plaintiff disputes that Sam's' articulated reasons warranted his termination under the circumstances, such an argument is not evidence of pretext. <u>See</u> <u>Combs v. Plantation Patterns, Inc.</u>, 106 F.3d 1519, 1543 (11th Cir. 1997)("[P]laintiff may not establish that an employer's reason is pretextual merely by questioning the wisdom of the employer's reason . . . ."); <u>see also</u> <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc)("Federal courts do not sit

as a super-personnel department that reexamines an entity's business decisions."). The evidence establishes Sam's' belief that Plaintiff violated company policy in a way that could have given him a personal financial gain.  This good faith belief is not pretextual, even if Plaintiff disputes its conclusion. See Foster v. BioLife Plasma Servs., LP, 566 Fed. Appx. 808, 811 (11th Cir. May 15, 2014)("A plaintiff cannot show pretext merely by showing that an employer's good faith belief that she engaged in misconduct is mistaken.")(citing Total Sys. Servs., 221 F.3d at 1176-77).

Plaintiff's bald assertions of discrimination in the absence of any *evidence* are insufficient to carry his burden. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion."); Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010)("it is not [the court's] role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive.").  Plaintiff cannot produce any evidence allowing a factfinder to disbelieve Sam's' articulated reason for his employment termination and, thus, Sam's is entitled to summary judgment as to each of Plaintiff's discrimination claims.

Additionally, Ms. Hodges, Mr. Newton, and Mr. Figueroa-Munoz had not met Plaintiff at the time of his termination. (DH p. 108, ll. 14-23; p. 109, l. 1; AFM p.

481, ll. 18-23).   Thus, none of them knew his race or age and could not have discriminated against him on those bases.   See Brown v. Shelby Cty. Bd. of Educ., No. 2:16-cv-1435-RDP, 2018 U.S. Dist. LEXIS 161719, * 31 (N.D. Ala. Sept. 21, 2018)(finding no pretext where, *inter alia*, decision-makers did not know plaintiff's race or age at the time the adverse employment action was taken).

Ms. Hodges and Mr. Bacote are, like Plaintiff, African-American (DH p. 107, ll. 6-8; MB p. 284, ll. 4-6); Ms. Rushforth, Mr. Bacote, and Mr. Figueroa-Munoz are, like Plaintiff, over 40. (AR p. 9, ll. 5-13; MB p. 281, ll. 12-13; AFM p. 117, ll. 19-23).[10]   It is unlikely that individuals within Plaintiff's same protected class(es) would discriminate against him on the basis of the protected class(es).   See Sykes v. Bd. of Trs. of the Univ. of Ala., No. 2:18-cv-713-GMB, 2019 U.S. Dist. LEXIS 181524, * 22 (N.D. Ala. Oct. 21, 2019)(finding that decision-maker in same protected class as Plaintiff "cuts against an inference of intentional discrimination"); Moorer v. City of Montgomery, No. 2:06-cv-672, 2008 U.S. Dist. LEXIS 124325, * 13 (M.D. Ala. Feb. 15, 2008)("it is extremely difficult for a plaintiff to establish discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff")(quoting Welch v. Delta Air Lines, Inc., 978 F.Supp. 1133, 1153 (N.D. Ga. 2007)).

---

[10] At the time of Plaintiff's termination, Mr. Newton was approximately two months away from turning 40 and entering the age-protected classification.  (BN p. 96, ll. 14-23).  Ms. Hodges was 39 at the time of the decision as well.  (DH p. 106, ll. 14-23; p. 107, ll. 1-5).

There is no genuine issue of material fact as to any of Plaintiff's discrimination claims and, therefore, Sam's is entitled to summary judgment on each.

**B.      Plaintiff's Negligence Claims Are Due to be Dismissed.**

To prove a claim of negligent hiring, training, supervision, or retention, "Plaintiff must establish two things: (1) that the underlying conduct of [the allegedly negligent employee] was wrongful or tortious; and (2) that Defendant had actual or constructive knowledge of [the employee's] incompetence." Ritchey v. Southern Nuclear Operating Co., No. 2:07-CV-1844-RDP, 2010 U.S. Deist. LEXIS 148569, * 69 (N.D. Ala. Mar. 29, 2010). "The 'incompetency' of the offending employee in a negligent training and supervision claim . . . must be based on an injury resulting from a tort which is recognized under Alabama common law." Sears v. PHP of Ala., Inc., No. 2:05cv304-ID, 2006 U.S. Dist. LEXIS 18460, * 58 (M.D. Ala. 2006).

Plaintiff cannot establish either element.   First, because Plaintiff's only possible state law claim – under the AADEA – is due to be dismissed at summary judgment, there is no conduct from which the negligence claims can derive. See Ogletree v. Bank of America, N.A., No. 1:11-CV-489-VEH, 2012 U.S. Dist. LEXIS 132097 (N.D. Ala. Sept. 17, 2012)("when a court concludes that the underlying purportedly wrongful conduct committed by the agent does not survive summary judgment, then the related negligent training and supervision claim is also subject to

27

dismissal"). The wrongful conduct to which Plaintiff attaches his negligence claim must constitute a violation of Alabama law and, thus, Plaintiff's federal law claims do not suffice. Short v. Mando Am. Corp., 805 F.Supp. 2d 1246, 1277 (M.D. Ala. 2011)( "[T]he underlying conduct must constitute a common-law, Alabama tort committed by the employee . . . not a federal cause of action such as Title VII.").

Second, even if Plaintiff established that someone at Sam's wrongfully committed age discrimination against him (which Sam's denies), there is no indication that Sam's knew or should have known that any such individuals (unnamed in Plaintiff's complaint) were incompetent. There is no evidence that any individual in this case had committed age discrimination in the past, much less any evidence that Sam's was aware of such conduct. See Agee v. Mercedes-Benz United States Int'l, Inc., No. 7:12-CV-4014-SLB, 2013 U.S. Dist. LEXIS 27443, *25 (N.D. Ala. Feb. 28, 2013)("in order to establish that the employee is incompetent, a plaintiff must allege prior similar acts of wrongdoing sufficient to establish that the employer knew or should have known that its employee, due to his incompetency, was prone to such wrongdoing."). Accordingly, even if there were some underlying tortious act, Plaintiff's negligence claims still fail and are due to be dismissed.

## IV.    CONCLUSION

Plaintiff admitted to conduct that violated Sam's' policies and procedures and Sam's held him accountable for that conduct. The company considered his actions

contrary to "the foundation of [its] culture . . . a commitment to operating with integrity." (Def. Ex. 8, p. 00364).  There is no evidence that Sam's' actions were discriminatory, negligent, or otherwise unlawful, and Sam's is entitled to summary judgment on each of Plaintiff's remaining claims.

Respectfully submitted this 6th day of March, 2020.


/s/ Jonathan S. Harbuck
Jonathan S. Harbuck (ASB-0906-U70J)

/s/ Lynlee Wells Palmer
Lynlee Wells Palmer (ASB-4367-T82P)

/s/ Brandon A. Jackson
Brandon A. Jackson (ASB-7622-U15X)

Attorneys for Defendant,
Sam's East, Inc.

**OF COUNSEL:**

**HARBUCK KEITH & HOLMES LLC**
Grandview II, Suite 400
3595 Grandview Parkway
Birmingham, Alabama 35243
Telephone: (205) 547-5540
Facsimile: (205) 547-5621
E-Mail:      jharbuck@hkh.law
             lpalmer@hkh.law

29

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will electronically send notice to the following counsel of record:

Alicia K. Haynes, Esq.
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35223
205-879-0377
Email: akhaynes@haynes-haynes.com


/s/ Lynlee Wells Palmer
OF COUNSEL

30