FILED
2021 Apr-05  PM 04:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREGORY MINARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:18-cv-01222-AKK** |
| | ) | |
| **SAM'S EAST, INC. D/B/A SAM'S** | ) | |
| **CLUB.** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

The parties in this litigation generally agree that Gregory Minard violated Sam's East, Inc.'s policy related to truckload sales, albeit Minard maintains he acted consistent with verbal instructions he received from someone in higher management. Basically, contrary to Sam's written policy, Minard pre-rang sales for truckload orders of french fries before the store received the fries. The pre-ringing of the orders purportedly allowed Minard to manipulate his eligibility for a bonus or to increase the size of his bonus. And, in violation of another Sam's policy, Minard's Club processed the sale of these orders by running the Member's credit card outside of the Member's presence. Minard's pre-ringing became an issue when a nationwide shortage of french fries in 2017 created a negative on-hand inventory at Minard's Club. The shortage meant that Minard's Club had processed orders for inventory it

never received, and that Members had pre-paid for french fries the Club could not deliver. After an investigation, and because Minard had two active coaching write-ups in his file, Sam's discharged Minard.

Minard filed this lawsuit, alleging claims against Sam's for (1) race discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Counts I and II); (2) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 and the Alabama Age Discrimination in Employment Act ("AADEA"), Ala. Code 1975, §25-1-20 (Count III); and (3) Negligent/Wanton Hiring, Training, Supervision and Retention under Alabama law (Count V).[1] Doc. 14. Among other things, Minard asserts that Sam's treated him differently than two other employees, younger and Caucasian, who engaged in the same conduct.

The court has for consideration Sam's motion for summary judgment, doc. 48, which is fully briefed, docs. 49; 58; 59; 71-72, and ripe for consideration. As explained in greater detail below, Minard has failed to show that his comparators are "similarly situated to him in all material respects,"[2] including bearing a "substantial likeness[]", or that they "engaged in the same basic conduct" cited by Sam's, or

---

[1] This court previously dismissed Minard's outrage claim (Count IV). *See* doc. 25.

[2] *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc).

shared the same disciplinary history.[3] Consequently, Minard cannot make a *prima facie* case of age or race discrimination. Relatedly, Minard failed to present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" and for him to bypass the *prima facie* case requirement.[4] Therefore, after carefully reviewing the briefs, the responses to the court's inquiry, docs. 71 and 72, evidence, and relevant law, the motion, doc. 48, is due to be granted.

## I.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-moving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and quotation marks omitted).

_____

[3] *Lewis*, 918 F.3d at 1227-28.

[4] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.

Minard is a 60-year-old African American man who worked for Sam's Club for over 32 years, most recently as Club Manager at the Irondale, Alabama location. Docs. 50-10 at 11-13; 57-3 at 1. Minard was the oldest of the fourteen Club Managers in his business market at the time of his discharge. Doc. 50-3 at 24-25, 124. Prior to the infraction that resulted in his discharge, Minard received multiple promotions, raises, positive annual reviews, and "recognition for exceptional store performance." Doc. 50-10 at 11-13. He did, however, have two active, written "coachings" in his file at the time of his discharge.[5] Doc. 50-7 at 28; 54-1 at 19-22.

During the relevant period, Athena Rushforth supported the Irondale Club as the Market Asset Protection Manager ("MAPM").[6] Before retiring, the previous MAPM, Melody Patrick, warned Minard that he "needed to watch out" for Rushforth as she may "be out to get" Minard, though she did not link this warning to race- or age-based animus. Docs. 50-1 at 54, 68-69; 57-2 at 1. Rushforth apparently refused to work with Minard "from day one," "very rarely" spoke to Minard, declined help

_____

[5] Coaching for Improvement is Sam's progressive discipline program. Docs. 50-1 at 18; 50-2 at 4-6. "[L]evels of coaching may be skipped, depending upon the determination by your supervisor or manager of the appropriate level of coaching for the particular situation [and] if . . . unacceptable conduct is found to be serious, this may result in . . . immediate termination." Doc. 50-2 at 4-6. And certain types of misconduct "may warrant immediate termination[,] includ[ing] . . . [t]heft, fraud or abuse of an associate benefit or other action involving financial integrity issues." *Id.*

[6] MAPMs investigate complaints and monitor compliance with loss prevention policies, working with Sam's Human Resources and U.S. Ethics Division. Docs. 50-1 at 54; 50-3 at 16.

from Minard in transitioning to her position, and "acted like she didn't want to be" in the Irondale Club. *Id.*; doc. 57-1 at 3. Minard's Assistant Manager, Nadine Smith, who is Caucasian and was 29 years old, "perceived [Rushforth] as an unfriendly and rude person." Docs. 50-1 at 16, 48; 57-1 at 1-4. As Minard puts it, Rushforth regularly interacted with younger Caucasian employees and "would not talk to [him] as a black African-American [but] was talking to mostly the white female management of [his] [C]lub." Doc. 50-1 at 68-69.

Relevant to this litigation, a Club makes sales in three ways: (1) directly from its in-store inventory, (2) through "truckload sales," which are larger quantities of merchandise it orders, receives, and processes payment for from a vendor on behalf of a Member, and (3) from merchandise it orders from a supplier to ship directly to one of its Members. Doc. 50-1 at 32-33, 65, 79. A Club rings up a sale when the Member pays for the item, and the Club takes credit for the sale by processing the transaction. *Id.* at 35-36. A Club pre-rings a sale when it runs a transaction through the register before the inventory is "on-hand" at the Club and available for sale. *Id.* at 45; doc. 50-6 at 5.

Sam's had a different policy for ringing up prepayments for truckload sales and direct-ship sales. Docs. 50-1 at 65; 50-3 at 61. In particular, Clubs can pre-ring direct-ship sales, docs. 50-3 at 61; 50-9 at 7, but are prohibited from pre-ringing truckload sales before the merchandise reaches the Club, docs. 50-1 at 53; 50-3 at

130; 54-2 at 40-65. Sam's requires instead that Clubs accept prepayment for a truckload sale into a "534" holding account. Thereafter, when the Club receives the merchandise, the Club may run the payment through the register and take credit for the sale. Docs. 50-1 at 36; 54-2 at 66-67. Because a sale is not registered as completed until it is rung up, *id.*, pre-ringing for truckload sales can financially benefit a Club's manager "because it might inflate the numbers at the end of the year or at the end of the quarter when bonuses . . . are calculated at the end of the month." Doc. 50-3 at 35.

Minard's responsibilities included selling merchandise by the truckload. Doc. 50-8 at 42. He made his first large truckload sale in 2012 to a food delivery company for ten truckloads of french fries. Doc. 57-3 at 3-4. For guidance in processing the sale, Minard contacted Don Mills, Vice President of Wholesale Trading, who had oversight over truckload sales. *Id.* Mills advised Minard to take prepayment in full and to "go ahead and . . . ring [the Member] up." *Id.*; doc. 50-1 at 35. Minard followed these instructions thereafter for truckload sales. Doc. 50-1 at 35.

Minard alleges that Marshall Bacote, his supervisor, and Patrick, the former MAPM, knew that he accepted prepayment and pre-rang truckload orders at the time the Member placed the order. Doc. 57-3 at 3-4. Indeed, Patrick testified that "[a]ll Clubs in [her] territory conducted truckload sales in the exact same manner." Doc. 57-2 at 1-4. And although Bacote denies knowing about the prepayment practice

before the issue with Minard escalated,[7] Bacote had praised Minard for his truckload sales. Docs. 50-1 at 23; 57-3 at 3-4.

As part of his truckload sales practices and in lieu of using the "534" hold account, Minard encouraged select Members to open Sam's credit cards with substantial lines of credit. Docs. 50-1 at 35-36, 42-43; 57-1 at 1-2, 4. He used the cards subsequently to process the truckload sales. Due to certain Members' security concerns about the Club's retention of their credit card information on file, Minard arranged to pick up the card, or for Smith, his assistant manager, or another employee to pick up the credit cards, ring up the sales at the Irondale Club, and then return the card to the Members.[8] *Id.* This arrangement involved pre-ringing the truckload

---

[7] Minard claims that Bacote had knowledge of this practice. Doc. 57-3 at 3.  Further, Minard sent Bacote an email on March 14, 2017 telling Bacote that Minard had to refund a member $19,426 because he did not have all of the french fries the member ordered. Doc. 54-5 at 69.

[8] Minard explained the credit card practice he used as follows:
Q. When a member places a truckload order, do they physically come in the club to do that?
A. Not in all cases.
Q. How did Wood Fruitticher handle it? Did they do it in person?
A. They did it both . . . It just depends on their availability . . . [I]f he was available, he would come over, place the order, and pay for it at that time. Or he would call and say, Hey, I want to place this order.
Q. When he called and said he wanted to place the order, how would he pay for it?
A. He would say, I'll be available for you -- for payment between this time. He would give us a window to get there to get the card. And only certain people were authorized to go and get that card because of the value of the card.
Q. Who was authorized to go and get the card?
A. Myself, Nadine, and we had one hourly associate . . . They would tell us—you know, they would basically say, Okay. Greg, I dealt with you. I want to deal with you. And Nadine would go with me sometimes, and Nadine would be there . . . [T]hey only would give that card out to people that they had met and talked to . . .

orders in order to "make sure that the merchandise was paid for before it left the [C]lub." Doc. 50-1 at 42.

Minard's truckload sale practices became an issue when Sam's experienced a nationwide shortage of french fries in 2017. Due to the shortage, Members who pre-paid for full truckloads of fries "would get a third of a truck . . . half of a truck [or] no truck" at all. Doc. 50-1 at 38, 51; 54-1 at 23-24. Essentially, the Irondale Club had processed orders for inventory it never received, and Members had pre-paid for french fries the Club could not deliver. Docs. 50-10 at 11-14; 54-1 at 23-24; 57-2 at 1-4; 57-3 at 3-4. This resulted in negative on-hand inventory at the Irondale Club. Docs. 49 at 8; 50-1 at 45; 50-4 at 27-28; 50-6 at 8. As a result, Minard alerted Patrick, who was still the MAPM at the time, and Bacote, and worked with his assistant manager to reconcile the issue. This entailed reviewing invoices and purchase orders and consulting with other Club Members. Docs. 50-1 at 48, 52; 54-1 at 23-24; 57-1 at 2; 57-3 at 6. Minard also reached out to market-level management for assistance. Docs. 50-1 at 48; 54-1 at 23-24; 57-3 at 6.

The shortage coincided with Patrick's retirement and Rushforth's arrival as the MAPM. Docs. 49 at 7; 50-1 at 16; 50-10 at 11-13; 54-1 at 23-24; 57-2 at 1. Shortly

---

Q. When you or Nadine or the hourly associate would go and get the card and bring it back to the club, would you then run that card to charge the order?
A. I never actually ran the card, but the card would be run.

Doc. 50-1 at 42-43.

after Rushforth assumed the duties, one of her direct reports flagged the negative on-hand inventory problem for Rushforth. Docs. 50-1 at 55; 50-4 at 9-10. Thereafter, Minard contacted Rushforth to request help and during those conversations Rushforth learned he had accepted pre-payment for the orders. Docs. 50-1 at 36, 51; 50-4 at 24; 50-10 at 11-13; 54-1 at 23-24; 54-2 at 12-20; 57-3 at 6.

For her part, Rushforth solicited the help of Daren Goodroe, who provided asset protection support at the home office, to determine the cause of the negative on-hand inventory. Docs. 50-4 at 10; 50-6 at 9. And Rushforth and Minard jointly participated in a conference call with several home office and loss prevention employees, including Goodroe, during which Minard described the problem and his attempts to address it. Docs. 49 at 9; 50-1 at 36, 51; 50-10 at 11-13. During the call, Goodroe informed Minard that he had committed a financial integrity violation. Docs. 50-4 at 32; 50-6 at 13. Also, Rushforth explained that Minard violated policy by "ringing up the sale of merchandise before the merchandise came into the [C]lub." Docs. 50-1 at 36, 51; 50-10 at 11-13. Rushforth and Goodroe allege that Minard admitted his error, docs. 50-4 at 58-59; 50-6 at 13, 16, acknowledged that he had not received approval from anyone at the market level to pre-ring the sales, and that he waited for six months to contact individuals in the market to discuss the issue after it initially surfaced in January 2017, docs. 50-4 at 22; 50-6 at 17; 54-5 at 53-65. Minard denies making these admissions and contends that he informed Goodroe and Rushforth that

"the home office" instructed him to accept prepayment for truckload orders. Doc. 50-1 at 51.

After the conference call, Rushforth informed her supervisor, Hugh Zengerle, the Regional Asset Protection Manager, that Minard violated "financial integrity" by "sell[ing] merchandise to a Member before merchandise was received in the Club." Docs. 49 at 10; 54-6 at 44. Rushforth conveyed that Minard acted without approval despite understanding "it was not the right thing to do." Doc. 54-6 at 44. She asserted also that Minard "did not reach out to anyone" at the market level about the inventory issues and that Minard and his assistant manager "r[ang] up merchandise without members present . . . using the Business credit card to pay." *Id.*

At Zengerle's request, Sam's U.S. Ethics[9] initiated an investigation under the direction of Deltrinae Hodges, Lead Case Manager, who had oversight of the investigation and the responsibility for making an accountability recommendation. Docs. 49 at 11-12; 54-2 at 2-8. Hodges assigned the matter to Rushforth because it

---

[9] Zengerle sent the following to Sam's US Ethics:

We have an incident potentially meeting the Immediately Reportable Criteria (IRC). Club Manager, Greg Minnard [sic], in Club 8212, Irondale, Alabama, admitted to Market Asset Protection Manager, Athena Rushforth and Sr. Manager of Experience Protection, Merchandise, Darren [sic] Goodroe that he has accepted payment for merchandise prior to the product arriving at the Club and being given to the Member. Additional concerns with these transaction [sic] are; [sic] 1. It is believed some of these transactions occurred in January of 2017 and could have potentially impacted bonus payout. 2. It is also believed that some of the transactions occurred without the member present. Below is a recap of the conversation between Rushforth, Goodroe, and Minnard [sic]. Rushforth and Goodroe can provide further details regarding these transactions upon request.

Doc. 54-2 at 2-3.

involved asset protection, and asked Rushforth to gather statements in support of her allegations. Docs. 50-4 at 14; 50-5 at 6; 50-7 at 7, 9; 54-5 at 53-66; 54-6 at 44. At the beginning of the investigation, Hodges informed Rushforth that Minard's admissions to Rushforth and Goodroe constituted a financial integrity issue and "false sale,"[10] for which Sam's could hold Minard accountable. Doc. 54-2 at 2-3. Based on Minard's two active coachings, Hodges concluded that the financial integrity issue could result in termination. *Id*. Hodges discussed the matter with Ben Newton, Senior Director of Ethics, who agreed that termination was appropriate based on Minard's admissions during the conference call. Doc. 50-5 at 11.

After gathering statements from Goodroe and Bacote and receiving guidance from Hodges that led her to believe the process could move to the accountability phase, doc. 54-5 at 55, Rushforth emailed Alejandro Figueroa-Munoz in HR Associate Relations. In her email, Rushforth provided suggested termination language and relayed that Hodges had recommended termination.[11] Docs. 50-7 at 8,

---

[10] Sam's defines "false sale" as "[r]ecording sales or returns that were not actually made, or where the merchandise had not yet been delivered when the sale was registered." Doc. 54-2 at 21-32.

[11] The record is unclear as to whether Hodges had already made the recommendation. Rushforth emailed Figueroa-Munoz on October 13, 2017, stating that "the decision by Deltrinae [Hodges] and team" was to terminate Minard. Doc. 54-3 at 20-22. In an email on October 11, Hodges told Rushforth she thought there was "enough to move forward with accountability," but stated she "would like to discuss [the case] with [her] manager" the following day and promised to follow up afterwards. Doc. 54-5 at 53-55. Hodges claims she made the recommendation to discharge in October, but she does not remember the exact date. Doc. 50-7 at 8-9.

25-26; 54-3 at 20-22. Figueroa-Munoz agreed Sam's could "process the termination [for] Gross misconduct integrity [for] repeatedly receiv[ing] payment . . . for large orders of [f]rench fries which were charged to the [M]ember before the orders were delivered to the [C]lub, [which] is against the policy and . . . a liability to the company." Doc. 54-3 at 20-22.

Subsequently, Bacote met with Minard to discharge him for "selling merchandise that was not present in the [C]lub," doc. 50-1 at 58-59. Bacote used the language prepared by Rushforth and Figueroa-Munoz. *Id.*; doc. 50-8 at 6-7; *compare* doc. 50-2 at 53 with 54-3 at 20-22. Minard alleges Bacote suggested that he should challenge the decision through the open-door process,[12] predicting "it would not . . . take long for [Minard] to get it turned around." Doc. 50-1 at 59. Bacote claims he and Minard discussed Minard's intent to use the open-door process, and Bacote told Minard "that the open door is there and you're welcome to use that as you see such." Doc. 50-8 at 7.

Minard indeed utilized the open-door process to challenge his discharge. Doc. 50-1 at 63-64. Matthew Waters, Senior HR Director, who performed the open-door investigation, gave a "comprehensive account" to the Field HR Vice President, and ultimately upheld the decision. Docs. 50-1 at 63; 54-6 at 23-24. Minard claims that

---

[12] The "open door" process allows employees to address concerns in their chain of command, up to and including the highest officer in the company. Doc. 50-1 at 24.

Waters admitted that the alleged conduct was insufficient for dismissal by stating, "Well, Greg, it must be more than this. You must have taken kickbacks or something for the truckloads." Doc. 50-1 at 63.

Following Minard's appeal, Hodges closed the casefile and recommended termination, docs. 50-7 at 9; 50-4 at 37; 54-2 at 2-8, noting that "[t]here will be no formal investigative recap for this case. The investigation was mostly complete when submitted," doc. 54-2 at 2-8. Hodges testified that she relied exclusively on Rushforth's information and statements for her recommendation. Docs. 50-4 at 14; 50-7 at 9, 13, 15-18. Newton, the Senior Director of Ethics, approved the recommendation without an independent investigation. Doc. 50-5 at 12-13, 20. This lawsuit eventually followed.

## III.

The court turns now to Sam's motion for summary judgment, beginning with the discrimination claims – race (Count I and II) and age (Count III) – in Section A and then the negligent/wanton hiring, training, and supervision claims (Count V) in Section B.

## A.

The parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* governs the discrimination claims. *See* docs. 49 at 20-21; 58 at 21 (citing 411 U.S. 792, 802-03 (1973)). Under that framework, Minard must

first establish by a preponderance of the evidence a *prima facie* case for his Title VII and § 1981 race claims and his age claims under the ADEA and the AADEA.[13] *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981). If he proves his *prima facie* case, the burden shifts to Sam's "to articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." *McDonnell Douglas*, 411 U.S. at 802. Minard must then prove by a preponderance of the evidence that Sam's purported reasons were not its true reasons, but rather a pretext for discrimination. *Burdine*, 450 U.S. at 248. Minard may accomplish this by: "(i) casting sufficient doubt on [Sam's] proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that [Sam's] proffered reasons were not what actually motivated its conduct, (ii) showing that [Sam's] articulated reason is false and that the false reason hid discrimination, or (iii) establishing that [Sam's] has failed to clearly articulate and follow its formal policies." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1186 (11th Cir. 2019).

To make a *prima facie* case, Minard must show "(1) []he belongs to a protected class, (2) that []he was subjected to an adverse employment action, (3) that []he was

---

[13] "Title VII and § 1981 claims have the same requirements of proof and use the same analytical framework." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256–57 (11th Cir. 2012) (citations and quotation marks omitted). The ADEA uses the same general framework. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). And, the Alabama Supreme Court has held that because the purpose and prohibitions of the AADEA are similar to those of the ADEA, ADEA principles govern in AADEA cases, and the *McDonnell-Douglas* framework "is the proper means by which to review an AADEA claim." *Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007).

qualified to perform the job in question, and (4) that h[is] employer treated 'similarly situated' employees outside h[is] class more favorably." *Lewis*, 918 F.3d at 1220-21. Sam's concedes that Minard satisfies all but the final element of the *prima facie* case: he is African American, over the age of forty, suffered an adverse employment action through his termination, and prior to the investigation which resulted in his termination, he was qualified to do the job. *See* doc. 49 at 19. Therefore, the court focuses only on the final prong of the *prima facie* case. As to this prong, Minard "must show that [ ]he and [his] comparators are 'similarly situated in all material respects.'"[14] *Lewis*, 918 F.3d at 1224.

Sitting *en banc* recently, the Eleventh Circuit instructed district courts to apply this similarly-situated standard "on a case-by-case basis, in the context of the individual circumstances" of the case, considering, among other things, whether the plaintiff and the comparators "engaged in the same basic conduct," "have been

---

[14] Of course, the failure to produce a comparator "does not necessarily doom [Minard's] case[:] a plaintiff will always survive summary judgment if he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis*, 934 F.3d at 1185 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)) (quotation marks omitted). But here, the only evidence—circumstantial or otherwise—that might allow an inference of discrimination is Rushforth's purported preference for associating with younger Caucasian women at the Irondale Club. Doc. 50-1 at 68-69. But Smith, a young Caucasian woman, testified that Rushforth was unpleasant as a rule. Doc. 57-1 at 3. Beyond Rushforth's interpersonal habits and demeanor, the only indication of racial bias is the purportedly differential treatment between Minard and his suggested comparators. Docs. 50-3 at 80-83; 50-7 at 22-23; 54-3 at 34-35; 54-4 at 2-5. Minard's other evidence of age-based discrimination is a single remark by an unnamed speaker disparaging notetaking with pencil and paper, and his own belief that older employees had stopped displaying years of service on their badge for fear of being pushed out by new management. Doc. 50-1 at 74-75. This evidence is insufficient to create the mosaic needed to bypass the comparator inquiry.

subject to the same employment policy, guideline, or rule," and share similar employment or disciplinary histories. *Id.* at 1227-28 (citations omitted).  In doing so, courts must be mindful that "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. This requires that "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* (citation omitted).  And while requiring "perfect identity [between the plaintiff and the comparator] is a non-starter," nonetheless, courts "must not stray too far from paradigmatic notions of discrimination, lest we sanction a regime in which treating *different* things differently violates Title VII, which clearly it does not." *Id.* at 1225 (emphasis in original). Also, courts must recognize that while "[a] plaintiff and a comparator might be alike in some (even random) sense, such that a comparison wouldn't necessarily be irrelevant or crazy," a "closer correspondence" is necessary because otherwise "the comparison wouldn't provide any sound basis for eliminating legitimate reasons for an employer's conduct or validly inferring discriminatory animus." *Id.*

With these guideposts in mind, the court turns now to Minard's comparators. And, for the reasons stated below, the court finds that Minard has failed to establish that Sam's treated him less favorably than similarly situated individuals outside his protected classes.

**1.**

**a**.

Minard cites his former assistant manager, Smith, who is Caucasian and was 29 years old, as a comparator. Doc. 50-1 at 16, 48; 57-1 at 1-2, 4. The record shows that during the investigation of Minard's conduct, the Ethics Team learned that Smith had also accepted prepayment for truckload sales and had processed credit cards outside the presence of the Club Member. Docs. 50-7 at 22; 54-3 at 27-28, 34-35; 54-4 at 2-5. During a separate investigation into Smith's conduct, Rushforth ultimately found that Smith engaged in the prohibited conduct at Minard's direction.[15] Docs. 50-7 at 22; 54-3 at 27-28, 34-35; 54-4 at 2-5. And, as Minard points out, Smith received no discipline for her conduct. Doc. 50-7 at 22.

Minard's reliance on Smith as a comparator is misplaced. To begin, Minard presented no evidence that he and Smith shared a similar disciplinary history. *See Lewis*, 918 F.3d at 1228. For example, Minard does not direct the court to anything in the record that shows the number of active verbal "coachings," if any, in Smith's file, and whether, like Minard, she was eligible for termination for her next

---

[15] Like Minard, Smith accepted prepayment for truckload sales and processed credit cards outside the Member's presence. Docs. 50-1 at 16, 48; 54-3 at 27-28; 57-1 at 1-2, 4. To be clear, Minard admits only that he accepted prepayment for truckload sales. Doc. 50-1 at 35. While there is no evidence that Minard processed credit cards himself, he admits that his Club processed cards for Members, *id*. at 42-43; *see* n. 8 *supra*, and Smith testified that Minard directed her to pick up and remotely process credit cards, doc. 54-3 at 27-28; 57-1 at 1-2, 4.

infraction. In the absence of such evidence, the court has no basis to find that Minard and Smith share similar disciplinary histories. *See id.* Moreover, there is nothing in the record showing that Sam's lacked a reasonable basis for its conclusion that Smith, who reported directly to Minard, acted at Minard's direction, docs. 50-7 at 22-24; 54-3 at 34-35; 54-4 at 2-5, and thus had less culpability.[16] While Minard maintains that he also acted at Mills' direction, by Minard's contention, however, Mills only instructed him to pre-ring the sales. Doc. 50-1 at 35. Minard does not allege that Mills or anyone else told him to process the credit cards outside of the Member's presence. And Minard admits that he took Smith with him to pick up the credit cards or sent her or another employee to do so, and that he knew "the card would be run." *See* n. 8 *supra*. Based on this record, Sam's had a reasonable basis for concluding that Smith acted at Minard's direction.

---

[16] "An employer is justified in holding management to a higher standard of performance." *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1371 (S.D. Fla.), *aff'd sub nom. Gaston v. Home Depo USA, Inc.*, 265 F.3d 1066 (11th Cir. 2001). *See also Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 917 (6th Cir. 2013) (holding employer could "reasonably justify holding [a manager] to a more stringent standard of conduct than that applied to [an] assistant manager."); *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (holding that company president was superior to, and thus not similarly situated to, other managers and professional level staff); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993) (holding employer may enforce a policy "against supervisors, who by virtue of their managerial positions are expected to know better, rather than subordinates" without engaging in discrimination). And, "if an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 (11th Cir. 1984), *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019) (citations omitted).

To close, "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respect' – *e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Lewis*, 918 F.3d at 1228.  Therefore, because Smith reported to Minard and the investigation showed she performed the misconduct at his direction, and in the absence of any evidence that she shared the same disciplinary history as Minard, no reasonable juror could view her as similarly situated to Minard.

**b.**

The second comparator Minard references is Elizabeth Bowler, who held the Club Manager position at the Trussville location, and also reported to Bacote. Docs. 50-8 at 3-4, 18; 57-3 at 4-5. In the course of this litigation, Minard asserted that Bowler also processed prepayment for french fry orders. Docs. 14 at 9-10, 59-60; 49 at 18; 50-1 at 70; 50-3 at 80; 54-3 at 6-8; 57-3 at 2, 4-7. Sam's investigated Minard's allegations and determined that although Bowler pre-rang orders, unlike Minard, she did so after the orders were in transit from the wholesaler to her Club. Docs. 50-3 at 80; 54-3 at 6-8. As Sam's puts it, in Minard's Club, "payment was taken and processed . . . more than 15 days" in advance of merchandise arrival, whereas "it[ was] not the same gap of time" in Bowler's Club. Doc. 50-3 at 82. Sam's concluded that the shorter window involved in Bowler's pre-ringing, *i.e.* while the french fries were in transit compared to Minard who pre-rang the sale on the date of the order,

made it less likely to inflate Bowler's bonus unlike Minard.[17] *Id.* at 81-82. And, unlike Minard, Sam's also found no indication that Bowler or her Club processed Members' credit cards outside their presence. *Id.*; doc. 50-1 at 42-43. Finally, Sam's found it significant that, unlike the Irondale Club, the Trussville Club had not reported any negative on-hand inventory problems related to the truckload sales. Doc. 50-3 at 129. As a result, Bowler received no discipline for her conduct. *Id.* at 83.

Minard challenges Sam's contention that he is not similarly situated to Bowler on multiple grounds. First, as to the shorter period between Bowler's pre-ringing and delivery to her Club, Minard states that "Bowler processed payments for truckload orders about a week before delivery on multiple occasions," doc. 58 at 19-20, and that "unless Sam's has evidence that Bowler had her [f]rench fries shipped by lengthy sea voyage, Bowler's alleged post-shipping prepayment practice is, at the very least, a disputed fact," *id.* at 24-25. Minard further claims Bowler pre-rang "'large truckload sales of [f]rench fries' in fiscal year 2017 that were not delivered until fiscal year 2018," citing a single sale processed on January 29, 2018 and received six days later. *Id.* at 19 (citing docs. 54-3 at 10-19; 57-3 at 6).

There are several flaws with Minard's contentions related to the timing of the

---

[17] Allegedly, in at least one instance, Minard's conduct occurred at the end of the fiscal year and over two weeks before the merchandise arrived at the Club, which inflated his numbers and purportedly increased his bonus. Doc. 50-3 at 81-82.

pre-ringing. To begin, he does not address Sam's contention that, unlike Bowler, Minard engaged in conduct that gamed the bonus system. Sam's investigation showed that Minard consistently processed prepayment for orders more than two weeks in advance of receiving the inventory, purportedly giving him ample opportunity to benefit financially from the pre-ringing. In contrast, Bowler's shorter time gap apparently made her likelihood of financial gain significantly lower. Minard counters by saying in his declaration that Bowler's conduct would have affected her bonus. Doc. 57-3 at 6. But he does not offer a pay stub to support this contention or offer any evidence tying a bonus Bowler received to the pre-ringing of sales. This difference in timing and its impact on bonuses, which Minard does not adequately address, render Minard's and Bowler's conduct meaningfully dissimilar.

Minard challenges next the credit card processing distinction. Relevant here, Minard admitted in his deposition that his Club violated another Sam's policy when it processed Members credit cards outside their presence, doc. 50-1 at 42-43. In lieu of offering evidence showing that Bowler engaged in the same conduct, Minard dismisses instead the fact that Bowler "did not take possession of a Member's credit card and run the card without a Member present" by claiming that "[n]either did [he]" and that "[r]egardless, credit card practices had nothing to do with [his] termination." Doc. 58 at 25. But this contention overlooks that Minard admits to his involvement with

improper credit card processing[18] — albeit he contends that he did not personally handle the cards—and that the credit card practices were connected to the pre-ringing of truckload sales that caused his termination. Indeed, Zengerle flagged the concern about the credit card practices when he alerted the Ethics Team about Minard's conduct: "Additional concerns with these transactions are; . . . 2. It is also believed that some of the transactions occurred without the [M]ember present." Doc. 54-2 at 3. And, these credit card transactions factored into the decision to investigate Minard's conduct: "The other concern brought up is that [Minard] was ringing up merchandise without our Members present . . . using the Business credit card to pay and then [Minard and Smith] would bring it back to our [M]embers to have them sign the Tax exempt." *See* doc. 54-6 at 44. Therefore, Minard's attempt to separate the credit card practices from the overall pre-ringing of truckload sales issue is unavailing. Accordingly, in the absence of any evidence that Bowler or her Club also utilized a similar practice, Minard has failed to establish that he and Bowler are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226.

Minard attacks next Sam's reliance on the negative on-hand inventory distinction. The evidence is undisputed that the Irondale Club's negative on-hand inventory factored into Minard's discharge. *See* docs. 50-1 at 36, 51; 50-4 at 24; 50-10 at 11-13; 54-1 at 23-24; 54-2 at 12-20; 57-3 at 6. Still, Minard contends that its existence

---

[18] *See* doc. 50-1 at 42–43. *See also* n. 8 *supra*.

is meaningless because "the evidence if properly construed suggests the problem was with the home office" and that the Irondale Club "outperformed almost every other in its Market in 2017 following the inventory confusion." Doc. 58 at 25-26. But the Irondale Club's performance is not the issue here—it is the relationship between the prohibited pre-ringing of sales and the resultant inventory issue. Sam's learned of Minard's practices because there was a problem at his Club that required input from multiple Sam's offices. While Minard claims that the inventory problem "had nothing to do with" his termination, *id.* at 26, his opinion on the relevance of the inventory issue, which Sam's cited in its investigation, does not eradicate its existence. And, unlike Minard's Club, the Trussville Club had not reported any negative on-hand inventory problems. *See* doc. 50-3 at 129. The lack of similar inventory issues means that Bowler's conduct took place under "very different underlying conditions" and that she is not similarly situated to Minard as a result. *See Lewis*, 918 F.3d at 1230.

In addition to failing to rebut the dissimilarities above, other than Minard's conclusory claim that Bowler "shared a similar employment and disciplinary history," doc. 59 at 22, Minard does not argue, and nothing in the record suggests, that Bowler had any active "coachings" at the time Sam's investigated her conduct. Rather than present such evidence, Minard claims instead that he "never once received so much as a verbal counseling related to his truckload sales procedures" and "Bowler . . . could

not possibly do better than perfect." Doc. 58 at 22-23. Basically, Minard treats his two active "coachings" as irrelevant because they were unrelated to "truckload sales procedures." But it is not the substance of the "coachings" that matters—it is their very existence. These two active "coachings" made Minard eligible for discharge under Sam's policies, doc. 50-7 at 28, an eligibility which the record does not show Bowler shared. Minard's failure to present any evidence of Bowler's purportedly similar disciplinary record precludes the court from finding that, like Minard, Bowler's infraction could lead to discharge, and that Sam's treated her differently than Minard.

### c.

To close, Bowler and Smith differ materially from Minard in their basic conduct, and employment and disciplinary histories. And Minard has failed also to demonstrate that Bowler and/or Smith bear a "substantive likeness" to him. *See Lewis*, 918 F.3d at 1227-28. The court recognizes that Minard has presented evidence that Bowler and Smith also pre-rang truckload orders. That showing, however, is only part of the analysis. Instead, the Circuit instructs that "in adopting a comparator standard, [courts] must not stray too far from paradigmatic notions of discrimination, lest [courts] sanction a regime in which treating *different* things differently violates Title VII, which clearly it does not." *Id*. at 1225 (emphasis in original). A closer examination here – as *Lewis* requires, *see id.* – reveals substantial differences in the two comparators' conduct, and employment or disciplinary

histories. These differences between Minard and his comparators preclude a finding of sufficient similarity "to permit a valid inference that invidious discrimination is afoot."[19] *Id.* Therefore, because neither comparator is similarly situated to Minard, Minard's *prima facie* case of race- or age-based discrimination fails, and Sam's motion is due to be granted.

## 2.

Alternatively, the discrimination claims fail because Minard cannot show that Sam's articulated reasons for his discharge are pretextual. *See Lewis*, 934 F.3d at 1185. Sam's burden at this stage is light and it easily meets it—violating a company policy constitutes a legitimate, non-discriminatory reason for termination. *See Usry v. Liberty Reg'l Med. Ctr., Inc.*, 560 F. App'x 883, 888 (11th Cir. 2014). Although he denies his conduct qualifies as wrongdoing, Minard admitted to pre-ringing truckload orders. Docs. 50-1 at 36, 51; 57-3 at 4. And because he performed this pre-ringing at the time the Member placed the order instead of when the Club received the merchandise, doc. 54-2 at 2-3, Minard violated Sam's policies, and had the opportunity to inflate his sales and increase his bonus, doc. 50-3 at 35. Moreover, Minard admitted that under his supervision, his Club processed Member credit cards outside the presence of the Members, doc. 50-1 at 35-36, 42-43, another violation of

---

[19] As *Lewis* instructs, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" 918 F.3d at 1228 (citation omitted).

policy. Also, two management employees who discussed the issue with Minard reported that Minard admitted that he knew he had engaged in prohibited conduct.[20] Docs. 50-4 at 22, 58-59; 50-6 at 13, 16-17; 54-5 at 53-65. Finally, Minard had two active "coachings," docs. 50-2 at 4-6; 50-3 at 65-68, 76-77, 90; 54-3 at 1-8, making him eligible for discharge were he to engage in "[t]heft, fraud or . . . other action involving financial integrity issues," doc. 50-2 at 4-6. Based on this entire record, Sam's had a valid basis for concluding that Minard's actions constituted a financial integrity issue. Docs. 50-4 at 58-59; 50-6 at 13, 16; 57-3 at 4.

"A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Bruno v. Greene Cty. Sch.*, 801 F. App'x 681, 685 (11th Cir. 2020) (citing *Brooks v. Cty. Comm'n of Jefferson Cty*, 446 F.3d 1160, 1163 (11th Cir. 2006)). Minard generally attacks his discharge by challenging the reason, noting some confusion over the policy cited for his discharge. Minard is correct that the record suggests that Sam's failed to adequately train its employees in the policies and procedures surrounding pre-ringing and truckload sales, docs. 50-3 at 72-73; 50-4 at 28, 30; 50-8 at 61, and that the resultant

---

[20] Minard denies making this admission. But even if Rushforth and Goodroe "were lying through their teeth[,] [t]he inquiry . . . is limited to whether [Sam's] believed" that Minard admitted to knowingly violating policy, and "if so, whether this belief was the reason behind [his] discharge." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The record supports a finding that Sam's had a good faith belief in the accuracy of the reports.

confusion may have perhaps created an unfair termination.[21] But this court "do[es]

not sit as a super-personnel department that reexamines [Sam's] business decisions."

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). And, the pretext

inquiry "centers on the employer's beliefs, not the employee's beliefs [nor] on reality

as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers,*

*Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). In that respect, Minard's disapproval of

Sam's decision to discharge him for violating a policy his supervisors did not fully

---

[21] For example, Rushforth and Merchandising Coordinator Reeca Dildy testified that accepting prepayment for merchandise that is not yet in the Club constitutes a "financial integrity" violation. Doc. 50-4 at 38. Both contend Clubs must "wait 24 hours after receiving the product" before accepting payment and ringing the sale through the register. Docs. 50-9 at 6-8, 13-14; 54-6 at 12-17. However, "[p]repayment [for truckload sales] can be accepted in full" when the order is placed, docs. 49 at 5; 54-2 at 39, <u>provided</u> that the transactions is placed in a special "534 account" until delivery rather than "rung up" at the register, doc. 50-3 at 58; 54-2 at 39. This policy proved logistically challenging for Members who wished to pre-pay with credit cards as card payments could not be deposited into the "534 account," doc. 50-9 at 5, and perhaps this is why Minard pre-rang the sales instead. In any event, Rushforth conceded she was "not familiar with the 534" account, doc. 50-4 at 28, and she "didn't know the correct way to do truckload sales because [sh]e w[as] not trained on [them]," *id.* at 30. Certainly, as Minard notes, as a MAPM, Rushforth should have known these polices. Doc. 50-3 at 72-73. And for his part, Marshall Bacote incorrectly believed the truckload sales policies are subject to at least some interpretation by the Club Manager. Doc. 50-8 at 61. When confronted with Bacote's comments, Figueroa-Munoz admitted Bacote did not fully understand Sam's policies. Doc. 50-3 at 72-73. While this evidence shows that Minard's supervisors did not truly understand the "534 account" hold policy, the confusion does not erase that Minard violated the policy against pre-ringing sales. This is not a case where Sam's discharged Minard even though he followed the proper "534" hold procedures. To the contrary, Minard testified that while he assumed the Irondale Club had a "534" hold account, he never used it. Doc. 50-1 at 44. Put simply, that higher management did not fully understand the mechanisms for pre-ringing truckload sales and the "534" hold account does not establish that Minard correctly followed the truckload sales policy or that discriminatory animus factored into his discharge. Indeed, Minard does not contest that he failed to follow the truckload sales policy, and states only he did, instead, what Mills told him to do.

understand and for following, in part, the direction of a senior manager[22] is irrelevant to assessing pretext.

Relevant here, Sam's stated reason for the termination is not false—Sam's policies indeed prohibit Minard's behavior, docs. 50-1 at 53; 50-3 at 130; 54-2 at 40-65; 54-3 at 20-22, and the two active "coachings" made Minard eligible for discharge.[23] Doc. 50-2 at 4-6. To be sure, Minard maintains he simply did what Mills in the home office instructed him to do many years previously. But this contention does not contradict the cited policy related to truckload sales, the conduct referenced in support of the discharge, nor does it address the processing of credit cards outside the Members' presence. Consequently, Minard has not established that the cited reason for his discharge was false.

Nor has Minard demonstrated that the "real" reason for his termination was discrimination. To support his contention of discriminatory animus, Minard cites Rushforth's unpleasant demeanor towards him, doc. 50-1 at 68-69, her failure to

---

[22] To be clear, Minard states only that Mills instructed him he could pre-ring the truckload sales. Minard does not allege any of his superiors directed him to process credit cards outside of the presence of Members.

[23] The Coaching for Improvement Policy expressly allows Sam's to skip issuing a third "coaching." Doc. 50-2 at 4-6. When "management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext." *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 873 (11th Cir. 2011).

punish or discharge the two comparators he references,[24] doc. 58 at 12, a remark by an unnamed speaker disparaging notetaking with pencil and paper which Minard contends is age-based,[25] and his conclusory observation that older employees stopped displaying their years of service on their badges because they feared new management would force them to retire.[26] Doc. 50-1 at 74-75. The cited evidence is "too weak to raise a genuine fact issue" regarding discriminatory animus. *Alvarez*, 610 F.3d at 1268 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). No credible basis exists from these contentions to support a finding that Rushforth's interactions with Minard were motivated by age or race bias, or that the other two cited examples also support bias against older employees. Moreover, Minard's focus on Rushforth overlooks that Goodroe also reported that Minard admitted that he knew his conduct was improper.[27] Doc. 50-6 at 13, 16. And, nothing

---

[24] As stated previously, neither Smith nor Bowler engaged in the same overall conduct and/or shared Minard's disciplinary history. *See* Section III.A.1 *supra*. As such, they are not valid comparators.

[25] Minard remembers an annual meeting speaker, who may or may not have been a Sam's employee, implying that "if you were writing with paper and a pencil instead of taking notes on a tablet or a phone, then you were kind of like a dinosaur." Doc. 50-1 at 74-75.

[26] More precisely, based on his sense that management had a "general feeling that the people who grew up in the Walmart culture during the '80s were resistant to change" and his perception that "people were starting to disappear because they were older," Minard stopped displaying his years of service on his badge. Doc. 50-1 at 74-75. Minard claims other employees made similar observations, but he provides no affidavits demonstrating this claim. His testimony regarding secondhand comments is inadmissible hearsay. *See Alvarez*, 610 F.3d at 1268 n. 10.

[27] Minard cursorily invokes the "cat's paw" doctrine by stating: "Rushforth's actions clearly demonstrate she had discriminatory animus and that she intended to, and did, influence [Sam's]

_____

employment decisions with respect to [Minard], satisfying the 'cat's paw' doctrine and rendering the 'formal decision-maker' label irrelevant." Doc. 58 at 31. "[A] 'cat's paw' theory of recovery may apply when a biased actor recommends that an adverse employment action be taken against an employee, but the biased actor is not the ultimate decision-maker." *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F.App'x 936, 938 (11th Cir. 2010) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)). To use this theory, however, Minard must show "that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson*, 186 F.3d 1328, 1332 (11th Cir. 1999).

The cat's paw theory fails for two reasons. First, Minard fails to show Rushforth's behavior constituted "discriminatory animus . . . based on [Minard's] protected characteristic." *Stimpson*, 186 F.3d at 1331. Minard's only evidence of Rushforth's purported animus is her unfriendly demeanor toward him, doc. 50-1 at 68-69, her alleged preference for associating with younger Caucasian women, *id.*, her allegedly inconsistent statements regarding his conduct, doc. 54-6 at 44, and her tone in an email discussing his termination, doc. 54-3 at 21. This evidence is insufficient to conclude that Rushforth's treatment of Minard was based on his race or age, *see* docs. 50-1 at 16; 54-3 at 21; 57-1 at 3, especially since Minard's substantially younger and Caucasian assistant manager reported that Rushforth treated her the same way, doc. 57-1 at 3.

Second, Minard's discharge was not based solely on Rushforth's recommendation. Minard attempts to cast blame on Rushforth by highlighting the opaque decision tree leading to the outcome. He points out that "by the company definition," Bacote had decision-making power over Minard's termination, doc. 50-3 at 79, but Bacote testified that he did not have "any say" in the matter, doc. 50-8 at 6-8, 72. Minard notes that Sam's contends that Figueroa-Munoz and Bacote determined Minard's conduct constituted gross misconduct warranting immediate dismissal after Hodges recommended termination, docs. 50-2 at 4-6; 50-3 at 29, 108; 57-4 at 8, that Rushforth testified that "the Ethics Team said to terminate," docs. 50-4 at 34; 54-3 at 20-22, and that Hodges testified that she does not recall when she made the recommendation to terminate, and she learned of Minard's termination only after he filed his open-door appeal, doc. 50-7 at 8. Also, Minard notes that the evidence shows that U.S. Ethics lacked the authority to discharge a Club Manager— the office could only make a recommendation. Docs. 50-3 at 79; 50-5 at 21-22; 50-7 at 5, 9. Indeed, the record is unclear as to where exactly the decision to discharge originated. But while Rushforth informed the decision-makers about Minard's pre-ringing and purportedly made false accusations against him, several independent factors contributed to the discharge, including Goodroe's corroboration that Minard admitted to knowingly committing misconduct, doc. 50-6 at 13, 16, and Minard's own admissions regarding pre-ringing and directing Smith to process credit cards without a Member present, doc. 50-1 at 35-36, 42-43. Moreover, while Hodges directed Rushforth to investigate Minard's conduct and relied on the investigation to recommend the discharge, docs. 50-5 at 6; 50-7 at 7; 54-6 at 44, Human Resources engaged in an independent investigation of Minard's subsequent open-door appeal, doc. 54-6 at 23-24. Minard has presented no evidence that Rushforth influenced the decision to reject his appeal. Ultimately, the record simply does not support Minard's contention that the decision-makers followed the purportedly discriminatory recommendation of Rushforth.

in the record indicates that Goodroe or the others involved in the investigation and decision—Hodges, Bacote, Figeroa-Munoz, and Newton—held any discriminatory animus towards Minard.

To close, there is something fundamentally unfair about discharging an employee for, in part, following instructions he maintains he received from someone in higher management or for engaging in conduct explicitly or implicitly tolerated by his direct supervisor or MAPM. But "[t]he question is whether [Sam's was] dissatisfied with [Minard] for . . . non-discriminatory reasons, even if mistakenly or unfairly so." *Alvarez*, 610 F.3d at 1266. That Sam's decision may be unfair is beside the point – "it is not [the court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Id*. Therefore, because the written policies prohibited Minard's conduct and in light of Minard's failure to establish the requisite discriminatory motive, summary judgment is warranted on this record.

**B.**

Minard pleads in Count V that Sam's engaged in negligent or wanton hiring, training, and retention by "fail[ing] to train, supervise, and discipline those employees who actively discriminated and conspired against Minard on an ongoing basis . . ." Doc. 14 at 24-25. Although Minard pleads general allegations against "highly-placed managers [who] engaged in intentional acts of discrimination . . . ,"

*see id.* at 23, Minard's response limits this claim to Rushforth, *see* doc. 59 at 32.

The claim fails for several reasons. First, one element required for a valid negligent hiring claim is that "the plaintiff must demonstrate that . . . the employee committed a tort recognized under Alabama law."[28] *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1357 (M.D. Ala. 2009). And, in light of Minard's failure to establish his Alabama age discrimination claim, he lacks the underlying tort to pursue his negligent or wanton claim.[29]

Second, even if Minard had a valid underlying tort claim, to prevail he "must

---

[28] The other elements are that "(2) the employer had actual notice of this conduct or would have gained such notice if it exercised due and proper diligence, and (3) the employer failed to respond to this notice adequately." *Edwards*, 603 F. Supp. 2d at 1357.

[29] Under Alabama law, a plaintiff alleging negligent hiring, training, retention, and supervision must prove that an employee committed unlawful conduct under Alabama common law. *See Shuler v. Ingram & Associates*, 441 Fed. Appx. 712, 720 (11th Cir. 2011). District courts disagree on whether the AADEA satisfies this common law requirement. Several courts have found that the AADEA cannot support a negligent hiring, training, retention, and supervision tort. *See Fulmer v. PCH Hotels & Resorts, Inc.*, 2020 WL 1929406, at *16 (N.D. Ala. Apr. 21, 2020) (citing *Shackelford v. Publix Super Markets, Inc.*, 2014 WL 5148461, at *16 (N.D. Ala. Oct. 14, 2014) ("Federal causes of action under . . . the ADEA as well as the Alabama statutory cause of action for age discrimination are not Alabama common law [and] cannot support a claim of negligent hiring, training, retention, and supervision."); *Gibbons v. CVS Health Corp.*, 2019 WL 4014834, at *9 (N.D. Ala. Aug. 26, 2019). But others, including this one, have found that because the Alabama Supreme Court has not ruled on this issue and because Alabama clearly contemplated creating a cause of action for age discrimination by passing the AADEA, the statute likely could support a claim for negligent hiring, training, retention, and supervision. *See Minard v. Sam's E., Inc.*, 2018 WL 6392200, at *4 (N.D. Ala. Dec. 6, 2018) (citing *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1269, n. 8 (N.D. Ala. 2014) (finding that because of the "legal uncertainty over whether the Supreme Court of Alabama would equate violations of the AADEA with wrongful conduct appropriate to support a negligent/wanton training theory under Alabama law," the negligent/wanton claim survived)); *McCreight v. AuburnBank*, 2020 WL 1061675, at *5 (M.D. Ala. Mar. 4, 2020). The disagreement on this issue does not help Minard because he does not have a valid AADEA claim. *See* Section III.A *supra.*

establish by affirmative proof that [Sam's] actually knew of [Rushforth's] incompetency, or . . . reasonably should have known of it." *Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1215-16 (Ala. 2008) (citations omitted).[30] This entails establishing that "specific acts of incompetency [were within] the knowledge of the master," or that the acts were "of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice." *Id.* In that regard, Minard claims that "Rushforth's malfeasance is littered throughout this record, and her lies are evident in [Sam's] own documents," doc. 59 at 32, citing Hodges' testimony that Rushforth's inconsistencies could indicate that she was "someone that's not forthcoming," docs. 50-4 at 14; 50-7 at 9, 13, 15-18. Minard adds that, "[t]he slightest bit of investigative effort would have exposed Rushforth," doc. 59 at 32, citing an email in which Rushforth allegedly "appears giddy—and, frankly, outright nutty—about the prospect of firing [Minard]," *id*. at 32 n. 20; doc. 54-3 at 20-22.[31]

---

[30] Because wantonness demands a higher standard of proof than negligence under Alabama law, Minard's failure to demonstrate negligence is fatal to his wantonness claim. *See Mazda Motor Corporation v. Hurst*, 261 So. 3d 167, 189 (Ala. 2017).

[31] The email reads:
Sir,
I know you are Super busy—Did you get a chance to look at this and decide—if you support…
As [sic] love your Leadership and Support to me ☺.
Please let me know—Yes/No and if a "Yes" Please—Help me with the termination terminology.
Thank You and always enjoy talking with you ☺.
You are Awesome ☺.
Ty

This evidence falls short of establishing that a reasonable jury would determine that Sam's had a reason to believe that Rushforth was incompetent to perform her duties. Rushforth sent the email at issue to Figueroa-Munoz requesting HR guidance in Minard's termination. Doc. 54-3 at 21. Minard contends that Rushforth's tone and use of smiley faces demonstrate her animus against Minard. But Rushforth sent the email to follow up on a more measured request for help she had sent earlier the same day. *Id.* Read in this context, the email is not the smoking gun Minard contends, nor does it demonstrate Sam's constructive knowledge of Rushforth's purported animus. Moreover, there is no other evidence in the record to suggest that Sam's knew or should have known that Rushforth had a history of dishonest or discriminatory behavior before this incident. Therefore, the motion on the negligent or wanton hiring, training, and retention claims also fail.

## IV.

For the reasons stated above, the motion for summary judgment, doc. 48, is due to be granted. A separate order will be issued in accordance with this opinion.

**DONE** the 5th day of April, 2021.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

_____

Doc. 54-3 at 21.

35